UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

U.S. WEST, INCORPORATED; KIEWIT
CONSTRUCTION COMPANY;
DYNALECTRIC COMPANY,
Plaintiffs-Appellees,

v.                                                                      No. 96-1698

AETNA CASUALTY & SURETY
COMPANY,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CA-95-879-A)

Argued: January 28, 1997

Decided: July 16, 1997

Before ERVIN and HAMILTON, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished opinion. Senior Judge Phillips wrote the
opinion, in which Judge Ervin and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** R. Daniel Lindahl, BULLIVANT, HOUSER, BAILEY,
PENDERGRASS & HOFFMAN, P.C., Portland, Oregon, for Appel-
lant. Douglas Leo Patin, SPRIGGS & HOLLINGSWORTH, Wash-

ington, D.C., for Appellees. **ON BRIEF:** Douglas G. Houser, BULLIVANT, HOUSER, BAILEY, PENDERGRASS & HOFF-MAN, P.C., Portland, Oregon; Roger S. Mackey, LAW OFFICES OF WILLIAM C.E. ROBINSON, Fairfax, Virginia, for Appellant. Andrew Bramnick, SPRIGGS & HOLLINGSWORTH, Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

This is a diversity action in which a building owner, a general contractor, and a subcontractor sued Aetna Casualty & Surety Company (Aetna) under an "all-risk" property insurance policy for losses incurred when large storage batteries installed by the subcontractor in the owner's building were damaged during installation and had to be replaced. The dispositive issue is whether the losses were excluded from coverage under the policy. The district court, following a bench trial, concluded that they were covered, rejecting Aetna's contention that they were excluded under the policy's terms. On Aetna's appeal, we affirm.

I.

In September 1988, U.S. West (Owner) and Kiewit Construction Company (General Contractor) entered into a contract for the construction of the Landmark Center in Omaha, Nebraska, a project that included a five-story data center. Integral to the data center was an uninterruptible power system (UPS) which was to serve as an emergency power source for the Owner's data equipment. Dynaelectric Company (Electrical Subcontractor) subcontracted to install the UPS along with other electrical work. Critical to the UPS were 1,880 electrical storage batteries. Each battery consisted of a large plastic jar

filled with sulphuric acid in which the battery plates were submerged; each battery then weighed around 400 pounds. The data center design called for locating the batteries on racks with several tiers of shelves. The Electrical Subcontractor used a two-step process in installing them. The batteries were first lifted by a hydraulically-powered cart to the desired shelf level. They were then slid from the end of the rack down the shelf to their intended location on the shelf. Each shelf consisted of two parallel metal rails covered with plastic casings. To aid in the sliding process, the Electrical Subcontractor covered the rails with a lubricant, Aqua Gel II, that was designed primarily for use in pulling wire through conduits and pipes. The Electrical Subcontractor had previously used other wire-pulling lubricants to install batteries, but had not before used Aqua Gel II for that purpose.

The batteries were all installed by this process between December 1990 and April 1991. In October 1991, it was discovered that some of the batteries were cracking on their bottom surfaces and leaking acid. Upon this discovery, the Owner invoked a warranty provision in the general contract which bound the General Contractor to correct all work by it or its subcontractors that was rejected by the Owner as defective under the General Contractor's warranty. Following negotiations between the General Contractor and the Electrical Subcontractor, those two agreed to share the cost of replacing all the plastic jars, whether or not leaks had developed in particular ones. All the jars were then removed and replaced with new ones into which the battery plates were put, and the whole then re-installed by another company than the Electrical Subcontractor. The total cost of replacing the batteries was $626,279.95 which was fully shared, per their agreement, by the General Contractor and the Electrical Subcontractor.

Analysis of the cracked and leaking battery jars revealed that the combined effect of sliding the batteries and using Aqua Gel II as a lubricant caused stress corrosion that resulted in the cracks. In particular, it was revealed that the chemical composition of Aqua Gel II was such as to constitute a corroding agent in its interaction with the plastic battery jars. The sliding process created scratches in the bottom surfaces of the jars which made them then more susceptible to cracking by the corrosive agent in the Aqua Gel II.

3

At the critical times in issue, the construction project was insured by the "All Risk" property insurance policies issued by Aetna whose coverage is the dispositive issue in this case. In December 1991, the Owner, as an insured under the policies, filed with Aetna a claim for the battery-replacement expenses. Aetna ultimately denied the claim, taking the position that the losses involved were expressly excluded under both the "faulty workmanship" and "latent defect" exclusion provisions of the policies. The Owner, the General Contractor, and the Electrical Subcontractor, each asserting that it was an insured under the policy, then jointly brought this action to recover on the claim denied by Aetna.[1] Following a two-day bench trial, the district court made findings of fact respecting the cause of the losses incurred and on their basis concluded that they were excluded by neither of the exclusion provisions relied upon by Aetna, hence were covered by the policies' basic coverage provision, and gave judgment accordingly against Aetna for the full amount of the claim.

This appeal by Aetna followed. Aetna challenges the district court's interpretation of the critical exclusion provisions and certain of the factual findings upon which the court based its application of the provisions as so interpreted.

II.

The critical provisions of the policies are those defining their basic coverage, the perils insured against, and two of the perils excluded, as follows:

> 6. COVERAGE
>
> Except as hereinafter excluded, this policy covers:

_____

[1] Following replacement of the batteries at the shared expense of the General Contractor and the Electrical Subcontractor, the Owner assigned to them jointly its right to receive payment under the insurance policies. In the district court, Aetna contested the two contractors' status as insureds under the policies, but does not challenge on this appeal the district court's determination that each was an insured.

4

(1) The interest of the Insured in all Real and Personal Property, including improvements and betterments, owned or used by the Insured, or hereafter constructed, erected, installed, or acquired, including while in course of construction, erection, installation, and assembly.

The perils that the property is insured against are described in section 7:

7. PERILS INSURED AGAINST

This policy insures against all risks of direct physical loss or damage to property described herein . . . except as hereinafter excluded.

The perils excluded from coverage are stated in section 8, which states in pertinent part:

8. PERILS EXCLUDED

This policy does not insure:

* * *

B. Against loss or damage caused by .. . inherent vice, latent defect, wear, tear, or gradual deterioration . . . .

* * *

F. The cost of making good defective design specifications, faulty materials, or faulty workmanship, however, this exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material or faulty workmanship.

5

As indicated, Aetna has relied throughout entirely upon the "latent defect" (Par. 8.B.) and "faulty workmanship" (Par. 8.F.) exclusions from coverage. There is no contention that coverage does not otherwise exist under the policies. Whether either exclusion applies is therefore dispositive of this appeal from the district court's decision holding that neither applied. We take them in turn, after a brief summary of their function in the general structure of these all-risk property insurance policies.

That structure is simple, though specific applications inevitably are not. Basic coverage of these policies runs to the interests of insureds in all of specified property, insuring against "all risks" of direct physical loss or damage to that property (as distinguished from only specified risks such as wind, fire, etc.), except as specific risks are then expressly excluded. The policies thus turn out to cover considerably less than all risks, with those risks less than "all" being simply identified by specific exclusion rather than by limitations upon the risks basically covered. Where, as here, coverage under such a policy is denied on the basis of particular exclusions, the dispositive issue is simply whether the peril that caused the loss or damage was one within either exclusion.

As prelude to our specific analysis of the two exclusions upon which Aetna relies, we observe that under Virginia law,[2] as generally, where an insurance policy's coverage turns on the interpretation and application of policy exceptions and exclusions of doubtful or ambiguous meaning, they are to be construed narrowly in favor of the insured. See Rush v. Hartford Mut. Ins. Co., 652 F. Supp. 1432, 1436 (W.D. Va. 1987) (so holding in applying Virginia law); First American Title Ins. Co. v. Seaboard Sav. & Loan Ass'n, 315 S.E.2d 842, 845 (Va. 1984) (same); see also M.H. Lipiner & Son, Inc. v. Hanover Ins. Co., 869 F.2d 685, 687 (2d Cir. 1989) (same; applying New York law); Equitable Fire & Marine Ins. Co. v. Allied Steel Constr. Co., 421 F.2d 512, 513 (10th Cir. 1970) (same; applying Oklahoma law).

_____

[2] Neither party challenges the district court's ruling that Virginia law governed resolution of the dispositive issue, nor does either suggest that in any critical respect Virginia law differs from that generally applicable to such issues.

6

And relatedly, we note that, as Aetna concedes, the insurer has the burden of proving that a loss falls within a particular policy exclusion.

A.

Aetna's primary reliance has been upon the "faulty workmanship" exclusion under which, as indicated, coverage is excluded (subject to one critical exception) for "the cost of making good . . . faulty workmanship." Aetna's contention runs essentially, though with more twists and turns, like this: The undisputed cause of loss, as found by the district court, "was the scratching of the batteries by sliding them on rails and use of Aqua Gel II which caused stress corrosion cracking," J.A. 306; these indisputably were incidents of the Electrical Subcontractor's "workmanship" which, because it produced a defective end product (the scratched and corroded batteries) was necessarily "faulty workmanship," whose cost of "making good" is expressly excluded from coverage. Put from a slightly different angle, Aetna says that the essential purpose of this exclusion is to confine covered losses to those that are "accidental" or "fortuitous" and not matters "within the sole control of the insured." And, says Aetna, what caused the loss here was not "accident" or "fortuity" but work methods employed by and under sole control of the Electrical subcontractor that were--as it turned out--"defective," hence "faulty."

The insureds, accepting Aetna's proposition that"fortuity" is dispositive of the issue, counter that fortuity exactly describes the cause of loss here. They point to the district court's critical findings that chemical incompatibilitiy of the Aqua Gel II with the plastic battery jars was the effective cause of the loss and that this incompatibility was unknown, and reasonably unknowable, to the Electrical Subcontractor, so that use of the substance could not be considered "faulty" workmanship, being instead a fortuity not within the insured's control.

Aetna challenges the legal relevance of these "no-fault" findings upon which rests the district court's ultimate finding that "fortuity" rather than "faulty workmanship" was the cause of loss. Whether the subcontractor was negligent or otherwise culpable as a matter of tort law is irrelevant, says Aetna, to the application of this exclusion.[3] The
_____
[3] To make this point, critical to its whole argument, Aetna relies heavily on the undeniable proposition that all-risk property insurance is not

7

district court's findings of the reasonable unforeseeability of the Aqua Gel's corrosive effect and therefore of no fault on the subcontractor's part in its use do not support the court's legal conclusion that there was therefore no "faulty workmanship." That there was faulty workmanship which caused the damage is conclusively demonstrated, says Aetna, by the undisputed fact that the product of the workmanship was "defective" so that, by definition, the workmanship that produced it was "defective," hence "faulty."

These opposing contentions--given here in what we believe is fair paraphrase of much more convoluted arguments by the parties--serve but to illustrate the ambiguity in context of the critical term, "faulty workmanship." It all depends on the term's focus.

Aetna's argument emphasizes the undeniable "fault" or "defect" in the end product of the workmanship, and reasons back from that: if a "fault" or "defect" in the product resulted from the insured's workmanship, then that "workmanship" necessarily was also "defective" or "faulty."

The insureds, however, emphasize that the literal language of the exclusion relates "fault" to the act of workmanship, thereby making the exclusion's applicability dependent upon a finding of some kind and degree of "fault," in the sense of culpability, on the part of the workman. On that interpretation, a finding of no avoidable fault in performance of the work, but instead of sheer "fortuity" as the cause

---

liability insurance: it provides "first-party" insurance against the risk of damage to or loss of the insured's property, not, as does "third-party" liability insurance, against the risk of the insured's liability to third parties. From this premise, however, Aetna's argument then takes a flatly incorrect next step: that all-risk property insurance, unlike liability insurance, is therefore unconcerned with establishing culpability on any one's part, being concerned only with establishing the cause of loss. Appellant's Br. 14-16. That proposition is of course true as to the basic coverage provisions of the two types of insurance, but that is as far as it holds up. Where, as is contended here, a property insurance policy bases an exclusion from its basic coverage precisely on some person's culpability, it necessarily is concerned with establishing culpability if the exclusion is invoked to avoid basic coverage.

8

of any defect in its product, perfectly supports the legal conclusion that there was not "faulty workmanship,"

In the face of such ambiguity, we are required by governing law to construe the term narrowly in favor of the insureds. Doing that here, we must accept the insured's interpretive theory that the exclusion only applies if fault--some form of avoidable dereliction--can be ascribed to the subcontractor's doing of the work at issue; that that is what is meant by "faulty workmanship." Under that theory, the district court's finding that "fortuity" rather than any form of avoidable fault by the subcontractor was the cause of the loss at issue has obvious relevance, indeed is dispositive of the issue if not clearly erroneous. And, it is not clearly erroneous. Though made on the basis of conflicting evidence, the court's finding of fortuity, not fault, is a "plausible account" of that evidence, see Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985), that cannot, therefore, be rejected as clearly erroneous under Fed. R. Civ. P. 52(a).

We therefore conclude that the loss at issue was not one excluded from coverage under the basic provisions of the faulty workmanship exclusion.**4**

B.

Aetna's reliance on the "latent defect" exclusion is also without merit. As indicated, Paragraph 8.B. of the policies excludes coverage for "loss or damage caused by . . . inherent vice, latent defect, wear, tear, or gradual deterioration. . . ." Aetna contends that the corrosive effect of the Aqua Gel II upon the plastic battery jars was a damage-

_____

**4** In view of this disposition, we do not address the insured's fall-back argument that even if faulty workmanship were proven, the exclusion nevertheless would not apply because of its exception of "damage resulting from . . . faulty workmanship." The argument specifically is that the exclusion only applies to "the cost of making good loss or damage from faulty workmanship" and that here the claim is not for that cost--which would only be for replacing the Aqua Gel II--but for that incurred in replacing the batteries that were damaged as a result of faulty workmanship. The district court did not address this alternative argument and, without expressing any opinion upon it, neither will we.

causing defect which was "latent" because it was not "readily discoverable." The insureds contend to the contrary, the district court held, and we agree, that as a matter of the literal language of this term, "latent defects" are only those integral to the damaged property by reason of its design or manufacture or construction. The corrosive effect of the Aqua Gel II surely resulted in a "defect" in and damage to the batteries, but it was not a defect integral to (latent in) their design, manufacture or construction. Cf. Tzung v. State Farm Fire & Cas. Co., 873 F.2d 1338, 1342 (9th Cir. 1989) (holding that soil expansion damage to a building was caused by a "latent defect" in the building's design and construction). Though, by definition, every "latent defect" in insured property is likely to be "not readily discoverable," the converse of that proposition does not follow. Not every defect that is not readily discoverable is a "latent" one; only those not readily discoverable that also are integral to the damaged property's design or manufacture or construction fit that description. The defect here does not fit it.

We therefore conclude that, as the district court held, coverage under the all-risk policies is not excluded by the"latent defect" exclusion.

AFFIRMED

10